UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

CAROL KAPLAN,

                                        Plaintiff,

                    -vs-                                        03-CV-0805C(F)

MULTIMEDIA ENTERTAINMENT, INC.,
GANNETT CO., INC.,

                                        Defendants.

_____

APPEARANCES:    CHIACCHIA & FLEMING (CHRISTEN ARCHER PIERROT, ESQ.,
                of Counsel), Hamburg, New York, for Plaintiff.

                NIXON PEABODY LLP (SUSAN C. RONEY, ESQ., of Counsel),
                Buffalo, New York, for Defendants.

## INTRODUCTION

Plaintiff originally brought suit against the defendants alleging, *inter alia,*
employment discrimination pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C.
§ 2000e, *et seq*. (Civil case number 02-CV-447).   This court granted the defendants'
motion for summary judgment, dismissing the action in its entirety, and the court's decision
was affirmed by the Second Circuit.  *See Kaplan v. Multimedia Entertainment, Inc.,* 2005
WL 2837561 (W.D.N.Y. October 27, 2005), *aff'd*, 199 Fed. Appx. 54 (2d Cir. 2006).  In this
action, plaintiff complains that certain actions taken by defendants following the filing of her
original lawsuit were taken in retaliation for her protected activity in violation of Title VII.
Defendants have now moved for summary judgment dismissing the retaliation action.

## BACKGROUND

Plaintiff began her employment at WGRZ-TV in 1990.  Between 1991 and 2002, she was assigned to the positions of reporter and co-anchor of the 5 p.m. newscast.  In April 2002, plaintiff was removed from the co-anchor position and was reassigned as a reporter. In June 2002, she commenced her first lawsuit alleging race, sex, and age discrimination. In August 2003, plaintiff's contract expired, yet she continued to work at WGRZ-TV on a non-contract basis.  In October 2003, while her discrimination lawsuit was still pending, plaintiff filed this lawsuit in New York State Supreme Court, Erie County, alleging retaliation.  The action was removed to this court on October 30, 2003 (Item 1).

In her complaint, plaintiff alleges that defendants retaliated against her by refusing to release her from a "non-compete clause" in her contract, converting her from "contract" to "non-contract" status, placing her on probationary status, subjecting her to an annual performance review, failing to award her a pay raise, keeping her "out of the loop," and attempting to cause her to quit her employment.  On March 26, 2004, plaintiff's employment was terminated when defendants learned that plaintiff had been driving in the course of her employment on a suspended license in violation of company policy.  On April 8, 2005, plaintiff amended her complaint, alleging that her termination was a further act of retaliation (Item 8).

Defendants filed this motion for summary judgment on January 30, 2007 (Item 22). They argue that plaintiff's allegations do not support a prima facie case of retaliation. Further, even if the court were to decide that plaintiff met her initial burden, defendants argue that they have presented legitimate, non-retaliatory reasons for their actions and plaintiff cannot show that those reasons are pretext for retaliation.  Finally, defendants

argue that plaintiff's claim for the intentional infliction of emotional distress is without merit.

For the reasons that follow, the defendants' motion for summary judgment is granted.

## FACTS[1]

In April 2002, plaintiff was reassigned from her position as a news anchor at WGRZ-TV to the position of reporter. The decision to reassign plaintiff was made by the President and General Manger of WGRZ-TV Darryll Green (Item 23, Exh. F, p.4). Green left WGRZ in August 2003 and took a similar position with another Gannett station in Washington, D.C. (*id.,* pp. 10-11). James Toellner became the President and General Manager of WGRZ-TV upon Green's departure (Item 23, Exh. G, pp. 19-20).

In June 2002, Ellen Crooke became the News Director of WGRZ-TV (Item 23, Exh. E, pp. 12-15). Ms. Crooke conducted a performance review of plaintiff in August 2003 (*id.,* pp. 1-4). It was the first formal performance review conducted of plaintiff since 1998 (Item 31, ¶ 10). In the 2003 review, plaintiff's strengths were identified as her knowledge of the area, her contacts, and her willingness to ask "tough questions" (Item 23, Exh. H). It was noted that she needed to work on her tardiness, the quality of her performance during live shots, and embracing her role as a reporter (*id.)*. Plaintiff's tardiness had been an issue when she was reassigned from the anchor position and continued to be an issue with Ms. Crooke (Item 23, Exh. E, pp. 17-19). Specifically, newsroom personnel were required to attend a 9:15 a.m. meeting, and plaintiff was frequently late for the meeting (*id.)*.

---

[1] This factual statement is taken from the defendants' Statement of Undisputed Facts (Item 25), plaintiff's Statement of Facts (Item 30), and the exhibits in support of and in opposition to the motion for summary judgment.

Plaintiff was a contract employee until August 2003 when her contract expired (Item 23, Exh. M).  At that time, plaintiff continued working at WGRZ-TV on a non-contract basis. She was put on a performance improvement plan to address certain issues, including tardiness, on-air performance, and her failure to file stories on the station's website (Item 23, Exh. F, pp. 28-29; Exh. O).  Plaintiff was also advised that the expiration of her contract released her from the "non-compete" clause (Item 23, Exh. R).  Prior to the expiration of her contract, plaintiff was advised that it was a violation of her contract to work in the Buffalo market at another station, although she could pursue employment opportunities at another Gannett station or in a non-Gannett market (Item 23, Exh. F, pp. 25, 35-36; Exh. O).

Plaintiff received all salary increases that had been negotiated in her contract (Item 23, Exh. S, pp. 21-22).  Her salary remained as negotiated even though she was no longer a news anchor (Item 23, Exh. I, p. 87).  She was not given a salary increase after the expiration of her contract in August 2003.

Plaintiff received a copy of an employee handbook on October 25, 1999 (Item 23, Exh. U).  The handbook contains a provision which prohibits employees from driving on company business with a suspended license (*id.,* Exh. W).  Plaintiff executed a consent form on August 19, 2003 which allowed WGRZ-TV access to the Department of Motor Vehicles ("DMV") records of its employees (*id.,* Exh X).  DMV records received by WGRZ-TV indicated that plaintiff's license had been suspended in December 2003 (*id.,* Exh. Y). Plaintiff received a notice from the Commonwealth of Pennsylvania in July 2003 informing her that her license would be suspended if she did not respond to a citation or summons previously issued (*id.,* Exh. Z).  She also received a notice from the New York State DMV

4

in January 2004 informing her that her license was suspended for failure to respond to a summons in the Town of Tonawanda (*id.,* Exh. AA).  Plaintiff did not inform her employer of her suspended license as required by the employee handbook and continued to drive to location shots in the course of her employment (*id.,* Exh. I, p. 42).  On March 25, 2004, plaintiff met with James Toellner, President and General Manager of WGRZ-TV, who advised her that she was to be suspended from her employment for the violation of the driving policy pending a further determination (*id.,* Exh. G, p. 44).  On March 26, 2004, plaintiff's employment was terminated for the policy infraction and because Mr. Toellner believed that plaintiff was evasive and misleading after the issue was raised with her (*id.,* pp 16, 79-80, 86).  Mr. Toellner terminated plaintiff's employment after consulting with his superiors (*id.,* pp. 56-57).

Despite being issued summonses in New York and Pennsylvania and failing to respond to them, and despite being sent notices that her driver's license would be suspended, plaintiff denied knowing that her license had been suspended and did not inform her employer of the suspension (Item 23, Exh. I, pp. 44-46).  Plaintiff further states that on March 25, 2004, after learning of her suspension from Mr. Toellner, she went to the DMV, paid the outstanding fines, and had her driving privileges restored (Item 31, ¶ 35).  Nonetheless, her employment was terminated.

## DISCUSSION

### A.  Summary Judgment Standard

Pursuant to Rule 56, summary judgment may be granted only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  *See*

Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *SCS Communications, Inc. v. Herrick Co.*, 360 F.3d 329, 338 (2d Cir. 2004). The court will not try issues of fact on a motion for summary judgment, but rather, will determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

Summary judgment is appropriate where the moving party has shown that "little or no evidence may be found in support of the nonmoving party's case. When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1223-24 (2d Cir. 1994) (internal citations omitted). If, however, "'as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper.'" *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 83 (2d Cir. 2004) (quoting *Gummo v. Village of Depew*, 75 F.3d 98, 107 (2d Cir.), *cert. denied*, 517 U.S. 1190 (1996)).

The moving party has the burden of showing that there are no material facts in dispute, and the court must resolve all ambiguities and draw all reasonable inferences in favor of the party opposing the motion. *Bickhardt v. Ratner*, 871 F.Supp. 613 (S.D.N.Y. 1994) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)). Thus, "summary judgment may be granted if, upon reviewing the evidence in the light most favorable to the non-movant, the court determines that there is no genuine issue of material fact and that

the movant is entitled to judgment as a matter of law." *Richardson v. Selsky*, 5 F.3d 616, 621 (2d Cir.1993).   The nonmoving party cannot survive summary judgment by casting mere "metaphysical doubt" upon the evidence produced by the moving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

## B.  Retaliation

Title VII prohibits employers from discriminating against an employee "because [s]he has opposed any practice made an unlawful employment practice by this subchapter, or because [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3(a).  To determine whether summary judgment is appropriate in a Title VII retaliation claim, courts apply the three-part burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  Under the *McDonnell Douglas* framework, the plaintiff carries the initial burden of proving a prima facie case of retaliation.  *Id.*  The defendant may then rebut by articulating a legitimate, non-retaliatory reason for its adverse employment action.  *Id.*  The defendant's burden at this stage is merely one of production, not persuasion.  *See St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 511 (1993).  However, once the defendant meets this burden, "[t]he presumption [of retaliation] . . . drops out of the picture."  *Id.* at 510-11 (internal quotation marks and citation omitted).  The burden then shifts back to the plaintiff to present sufficient evidence to permit a rational finder of fact to infer that the defendant's proffered reason is a pretext and that the employment decision was motivated by unlawful discrimination.  *See Stern v. Trs. of Columbia Univ. in the City of N.Y.*, 131 F.3d 305, 312 (2d Cir. 1997).

The employee's burden of proof at the prima facie stage of a summary judgment motion is minimal.  *See Bennett v. Watson Wyatt & Co.,* 136 F. Supp. 2d 236, 246 (S.D.N.Y. 2001).  However, the employee must proffer some admissible evidence of circumstances that would be sufficient to permit an inference of retaliatory motive.  *See Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 204 (2d Cir. 1995).  To make out a prima facie case of retaliation, the employee must demonstrate: (1) participation in a protected activity known to the defendant; (2) an employment action disadvantaging the plaintiff; and (3) a causal connection between the protected activity and the adverse employment action.  *See Hunter v. St. Francis Hosp.*, 281 F. Supp. 2d 534, 546-47 (E.D.N.Y. 2003) (citing *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 769 (2d Cir. 1998)).  The adverse employment action must be one that a reasonable employee would have found materially adverse; *i.e.*, "it might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  *Burlington N. & Sante Fe Ry. Co.*, 548 U.S. 53, 126 S. Ct. 2405, 2415 (2006) (internal quotation marks and citation omitted).  With respect to the causation element, a causal connection may be established by showing that the retaliatory action occurred close in time to the protected activity. *Hunter,* 281 F. Supp. 2d at 547.

Defendants concede that plaintiff has satisfied the first element of the prima facie case, in that she complained of discrimination of which the employer was aware.  However, defendants argue that several of the retaliatory acts asserted by plaintiff do not constitute "adverse employment actions," and further that plaintiff can show no causal connection between her protected activity and the alleged adverse employment actions.

Plaintiff has alleged the following retaliatory actions by defendants:

8

1.  Plaintiff was subjected to a performance review in August 2003;

2.  She was not released from the "non-compete" clause in her contract;

3.  She was not given a pay raise after the expiration of her contract in

    August 2003; and

4.  She was terminated from her employment on March 26, 2004.

Additionally, plaintiff complains that she was not invited to social events, was not personally informed of Christmas "promotional shoots," was not given "high profile" assignments, was periodically asked to work nights and weekends, and had her involvement in the Channel 2 "Buddy Check" program curtailed.[2]  Defendants argue that this last group of allegations constitutes nothing more than "petty slights" and "minor annoyances" which are not actionable under Title VII.

In *Burlngton Northern,* the Supreme Court spoke of "material adversity" because "it is important to separate significant from trivial harms."  *Burlington Northern,* 126 S. Ct. at 2415.  Title VII does not set forth "a general civility code for the American workplace." *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 80 (1998); *see Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (judicial standards for sexual harassment must "filter out complaints attacking 'the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing'").

> An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience.   The anti-retaliation provision seeks to prevent employer interference with "unfettered access" to Title VII's remedial mechanisms.  It does so by prohibiting employer actions that are likely "to deter victims of discrimination from complaining to the EEOC," the courts, and their employers.  And normally petty slights, minor

---

[2] The "Buddy Check" program was a breast cancer awareness program of which plaintiff was the spokesperson.

annoyances, and simple lack of good manners will not create such
deterrence.

*Burlington Northern,* 126 S.Ct. at 2415 (internal citations omitted).

Turning first to the so-called "petty slights," the court agrees with defendants that
plaintiff has failed to show that these actions are materially adverse in that they might have
dissuaded a reasonable employee from making a charge of discrimination.   Plaintiff
complains that she was not invited to social events after her reassignment as a reporter,
but admits that certain events were attended only by anchors.  When asked during her
deposition to name an event that other reporters were invited to but from which she was
excluded, she could name only one event, which was geared toward minorities and which
an African-American reporter attended (Item 23, Exh. J, pp. 19-20).   Plaintiff also
complained that she was not invited to Christmas "promotional shoots " in 2002 and 2003,
but had no knowledge whether she was intentionally excluded (*id.,* p. 23).   As for the
"Buddy Check" program, it is not disputed that the program's sponsor withdrew its support,
and the program became a station-oriented program which included all the female anchors
and reporters (Item 23, Exh. F, p. 47).   Plaintiff's diminished role in the Buddy Check
program was a natural consequence of the overall change in the program.  While plaintiff
was occasionally asked to work nights and weekends, she admits that this was not a
permanent change in her schedule, but a temporary change to cover personnel shortages
(Item 23, Exh. J, p. 74).   She also complains that her desk was moved to a less private
area, but admits that the change was made to facilitate the anchors being located together
(*id.,* p. 89).  Finally, plaintiff complains that she was not given high-profile assignments and
that her story ideas were dismissed or belittled, yet admits that she was often the

secondary reporter covering the trial of the "Lackawanna Six" (*id.,* pp. 79-80).   She

complains that the news director, Ellen Crooke, her immediate supervisor from August

2003, treated her with contempt and made facial expressions and gestures that suggested

Crooke's view that plaintiff was "stupid."   These unpleasantries are exactly what the

Supreme Court intended when it stated that "petty slights" and "minor annoyances" are

often a part of the typical work place and are not actionable as retaliation under Title VII.

Plaintiff has not established that any of these alleged actions were materially adverse such

that a reasonable employee would be dissuaded from filing a charge of discrimination.

*See Byrne v. Telesector Resources Group, Inc.*, 2007 WL 962929, *15-16 (W.D.N.Y.

March 29, 2007) (shifting of duties, request to work on weekend were not materially

adverse).

        Additionally, plaintiff complains that her performance evaluation in August 2003 was

a materially adverse employment action.   While plaintiff states that she had never before

received a negative evaluation, it is undisputed that she was removed from her anchor

duties in 2002 due to performance and tardiness issues.   Her evaluation in 1999 noted

problems with time management (Item 33, Exh. A).   It is obvious that subjecting an

employee to a performance evaluation, a tool by which an employer can assess the

strengths and weaknesses of an employee, cannot itself be termed a materially adverse

employment action. Likewise, criticism of an employee, which is necessarily part of the

employment relationship, is not an adverse employment action.  *See Henriquez v. Times

Herald Record*, 1997 WL 732444, at *5 (S.D.N.Y. November 25, 1997) (criticisms and

threats of disciplinary action are not adverse employment actions), *aff'd*, 165 F.3d 14 (2d

Cir. 1998).   Here, plaintiff's 2003 evaluation, in which Ms. Crooke discussed plaintiff's

strengths and areas requiring improvement, and the "performance improvement plan" ("PIP"), by which WGRZ-TV management sought to monitor and improve plaintiff's job performance, do not constitute materially adverse employment actions that would deter a reasonable employee from making a charge of discrimination.  There is no proof that, as a result of the 2003 performance evaluation or PIP, plaintiff suffered any cognizable harm either in the form of a pecuniary injury or "the sort of non-monetizable, yet still actionable, harm resulting from the loss of prestige or professional opportunity. . . ."  *See Charles v. City of New York,* 2007 WL 2728407, *11 (S.D.N.Y. September 17, 2007).

Plaintiff also complains that she was not released from the "non-compete " clause of her contract and that she was not awarded a pay increase after the expiration of her contract.  It is undisputed that she received all raises negotiated in the contract and earned the salary that was negotiated when she was an anchor.  Additionally, it is also undisputed that at the expiration of her contract, plaintiff was released from the non-compete clause and was free to pursue employment opportunities at other television stations in the Buffalo market.  There is nothing retaliatory about holding an employee to a negotiated contractual agreement while management likewise fulfills its obligations under the contract.  While plaintiff states that other employees were released from their non-compete clauses, she has offered no admissible proof of this assertion.

Even assuming that these latter actions were materially adverse employment actions for purposes of Title VII, plaintiff has shown no causal connection between the alleged retaliatory action and her protected activity and thus has failed to establish a prima facie case of retaliation.  Plaintiff filed her original lawsuit in June 2002 following her reassignment from anchor duties.  It was not until August 2003, more than a year later, that

her contract was not renewed, she received a negative performance review, and did not receive a pay raise.  This Circuit "has not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly  retaliatory action." *Gorman-Bakos v. Cornell Co-op Extension of Schenectady County*, 252 F.3d 545, 554 (2d Cir. 2001) (collecting cases).  However, courts have held that a plaintiff relying solely on temporal proximity to show causation must demonstrate a "very close connection" in time between the protected activity and the alleged retaliation.  *See, e.g., Carter v. New York*, 310 F. Supp. 2d 468, 478, n. 5 (N.D.N.Y. 2004), *aff'd* 151 Fed. Appx. 40 (2d Cir. 2005) (four months was too long to establish a causal connection between the protected activity and the alleged retaliation, citing *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001)).  Time periods greater than one year have generally been rejected when offered to indirectly establish a causal connection between an act and its purported consequences.  *Deravin v. Kerik*, 2007 WL 1029895, *11 (S.D.N.Y. April 2, 2007).   Here, the fourteen-month time lapse between the filing of the lawsuit and the alleged retaliatory action is too great to support an inference of a causal connection.  *See Yarde v. Good Samaritan Hosp.*, 360 F. Supp. 2d 552, 562 (S.D.N.Y. 2005) ("Three months is on the outer edge of what courts in this circuit recognize as sufficiently proximate to admit of an inference of causation.").

Finally, plaintiff complains that her termination was retaliatory.  Assuming that plaintiff has stated a prima facie case of retaliatory discharge, defendant has offered a legitimate, non-retaliatory reason for plaintiff's termination–the violation of the driving policy.  It is undisputed that plaintiff was given a copy of the employee handbook which

prohibited driving on company business with a suspended or revoked license.  It is also undisputed that plaintiff violated the policy by driving to live shots while her license was suspended.

While the consequence of termination for the violation of the driving policy may have been harsh, plaintiff has offered no proof of retaliatory animus or evidence of pretext.  Her assertion that she did not knowingly violate the policy as she was unaware of the suspension of her license is not sufficient to rebut defendants' legitimate reason for her termination.  *See Gurry v. Merck & Co.,* 2003 WL 1878414, *7 n.9 (S.D.N.Y. April 14, 2003) (plaintiff's subjective belief that she did not misrepresent her employment history was insufficient to rebut legitimate reason for discharge).  Likewise, plaintiff failed to offer any circumstantial proof that could demonstrate pretext, such as an inconsistent enforcement of the driving policy.  *See Greenway v. Buffalo Hilton Hotel,* 143 F.3d 47, 51 (2d Cir. 1998). Additionally, plaintiff's termination occurred in March 2004, nearly two years following the filing of her initial lawsuit.  As stated above, this lapse in time between the protected activity and the alleged adverse employment action is too great to support an inference of a causal connection.   Accordingly, defendants' motion for summary judgment is granted, and plaintiff's retaliation claim is dismissed.

## C.  Intentional Infliction of Emotional Distress

Finally, plaintiff has alleged a claim for the intentional infliction of emotional distress.[3]  "'One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress.'"

---

[3]  Plaintiff has not addressed this claim in her brief, and so the court assumes that she has conceded that the claim should be dismissed.

*Fischer v. Maloney*, 373 N.E.2d 1215, 1217 (1978) (quoting Restatement (Second) of Torts § 46 (1977)).  To state a claim, a plaintiff must allege "extreme and outrageous conduct, which so transcends the bounds of decency as to be regarded as atrocious and intolerable in a civilized society."  *Freihofer v. Hearst Corp.*, 480 N.E.2d 349, 355 (1985) (citing *Fischer,* 373 N.E.2d at 1217, and *Murphy v. American Home Prods. Corp.*, 448 N.E.2d 86, 90 (1983)).  Despite lengthy discovery, plaintiff has failed to satisfy this rigorous standard. *See Martin v. Citibank, N.A.*, 762 F.2d 212, 220 (2d Cir. 1985) ("New York courts have been very strict" in reviewing intentional infliction of emotional distress claims for requisite outrageousness); *Magee v. Paul Revere Life Ins. Co.*, 954 F. Supp. 582, 587 (S.D.N.Y. 1997).  Accordingly, defendants' motion for summary judgment dismissing the intentional infliction of emotional distress cause of action is granted.

## CONCLUSION

The defendants' motion for summary judgment is granted, and the complaint is dismissed.  The Clerk is directed to enter judgment in favor of defendants.

So ordered.

\_\_\_\_\_\s\   John   T.   Curtin_____
JOHN T. CURTIN
United States District Judge

Dated:   March 5          , 2008
p:\opinions\03-805.feb1908